## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HENRY ERIC HAMILTON,

    Petitioner,

v.

                                    Civil Action No.:  BAH-21-2417

WARDEN DAVID GREENE, *et al.*,

    Respondents.

## MEMORANDUM OPINION

Petitioner Henry Eric Hamilton filed a Petition for a Writ of Habeas Corpus pursuant to

28 U.S.C. § 2254 in which he challenges his 2015 conviction for conspiracy to commit first-degree

assault. The Petition is fully briefed. Upon review of the submitted materials, the Court finds no

need for an evidentiary hearing. *See* Rule 8(a), Rules Governing Section 2254 Cases in the United

States District Courts; D. Md. Local R. 105.6. For the reasons set forth below, the Petition will be

DENIED and a certificate of appealability shall not issue.

### BACKGROUND

I.     **Conviction and Sentence**

Hamilton stood trial on fourteen separate counts in the Circuit Court for Cecil County,

Maryland in connection with the September 24, 2014 shooting death of Harrison Meran-Garcia

and the wounding of Alexander Meran. *See Hamilton v. State*, 2018 WL 904348, at \*2 (Md. App. Feb. 14, 2018)[1]; ECF 1-6 at 54.[2]  The following events led to Hamilton's arrest and trial.

On September 24, 2014, Alexander Meran and his uncle Harrison Meran-Garcia drove to Hamilton's house in Elkton, Maryland for the purpose of delivering cocaine to Hamilton.  ECF 1-15, at 10, 13, 27.  Meran-Garcia was known to Hamilton as a drug dealer named "Fernando."  ECF 1-6, at 60.  Meran-Garcia had been to Hamilton's house several times in the past and Hamilton was expecting him that evening.  *Id.*  According to text messages found on Meran-Garcia's phone, he was bringing Hamilton cocaine which Hamilton intended to sell to Bank of America employees.  ECF 1-13, at 66-70.[3]

---

[1] On November 8, 2022, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland and the Court of Special Appeals was renamed the Appellate Court of Maryland. The name change took effect on December 14, 2022. This was a change in name only and does not affect the precedential value of the opinions of the two courts issued before the effective date of the name change.

[2] Petitioner attached the unreported opinion of the Maryland Appellate Court addressing his direct appeal, which includes a summary of many of the relevant facts.  *See* ECF 1-6, at 52 – 93.  The opinion is also available at *Hamilton v. State*, No. 736, 2018 WL 904348 (Md. App. Feb. 14, 2018). For convenience, the Court will cite primarily to the copy attached to the petition.  *See* ECF 1-6, at 52-91.  Other opinions from the Appellate Court of Maryland addressing Hamilton's claims are also attached to his filings.  The Court will generally cite to them by citing to the attached copies and occasionally to a Westlaw citation.

[3] Petitioner attaches portions of the transcript of trials and relevant hearings at ECF 1-9, at 1-20 (pretrial conference), ECF 1-10, at 1-6 (pretrial conference), ECF 1-11, at 1-38 (motions hearing), ECF 1-12, at 1-162 (trial day one, March 23, 2015), ECF 1-13, at 1-126 (trial day three, March 25, 2015), ECF 1-14, at 2-196 (trial day two, March 24, 2015); ECF 1-15, at 1-123 (trial day four, March 26, 2015); ECF 1-16, at 1-86 (trial day five, March 27, 2015); ECF 1-17, at 1-60 (motion for a new trial and sentencing), ECF 1-18, at 1-6 (preliminary proceedings), ECF 1-19, at 1-3 (pretrial conference), ECF 1-4, at 2-324 (postconviction hearing); ECF 1-5, at 1-124 (reconsideration of posttrial motion).  After the Court noticed that some pages were missing in ECF 1-14, Respondent provided new transcripts for the March 24 and 25, 2015 trial dates.  *See* ECF 23-1, at 1-196 (trial day two, March 24, 2015); ECF 23-2, at 1-129 (trial day three, March 25, 2015).

According to Meran, his uncle drove into Hamilton's driveway and shortly thereafter Hamilton came to the side of the car and spoke briefly with Meran-Garcia. ECF 1-15, at 13-14. Because Meran does not speak English, he could not provide any information regarding the content of the conversation. *Id.* at 14. Hamilton returned to the house and started sweeping the front porch and, according to Meran, "bullets started flying." *Id.* Meran did not see anyone other than Hamilton approach the car. *Id.* at 15. As shots penetrated the car, Meran-Garcia put the car in reverse and stepped on the gas causing the car to collide with trees located at the end of the driveway. *Id.* Although he had been shot five times, Meran managed to escape through a window into the woods nearby. *Id.* Meran-Garcia sustained multiple gunshot wounds and was pronounced dead at the scene. ECF 1-14, at 45-46, 70-103.

Deputy Jonathan Wight of the Cecil County Sheriff's Office reported to the area after receiving a call for multiple shots fired. *Id.* at 32. Upon his arrival, Wight observed a car in the wood line approximately twenty to thirty feet off the driveway of Hamilton's residence. *Id.* at 32-33. Wight saw a black male in the driver's seat with a gunshot wound to his face with no signs of life; a plastic bag containing a white substance was in his hand. *Id.* at 33. Meanwhile, Meran managed to convey his need for assistance to a 911 dispatch officer and, upon encountering two other Cecil County Sheriff's deputies, was taken to the hospital for treatment. ECF 1-15, at 99-100.

Through the trial testimony of Anastasia Maivelett and Kimberlie Perez it was established that Hamilton and his son, Hank Hamilton,[4] went to a nearby marina following the shooting at Hamilton's house. ECF 23-2, at 16. Perez, who was Hamilton's girlfriend, testified that after leaving work at 11:30 p.m. she met Hamilton and Hank at a restaurant off the marina where

---

[4] The Court will use Hank Hamilton's first name throughout this opinion to avoid confusion.

3

Hamilton docked his boat. *Id.* at 34. Hamilton asked Perez to take Hank back to the house so he could get his car, but the police were at the house, so they drove back to the marina. *Id.* at 36.

Maivelett, who was Hank's girlfriend, testified that at approximately 1:00 a.m., Hank contacted her and asked her to pick him up in Chesapeake City where Hamilton had taken Perez and Hank by boat. ECF 23-2, at 15-16. When she arrived, Maivelett recalled seeing Hamilton backing his boat into the dock. *Id.* Hank then took bags, which she recognized as bags he used to store his guns, off the boat and put them in the trunk of her car. *Id.* at 17. Maivelett then drove Hamilton, Perez, and Hank to the hotel where Hank had been staying and found a room for Hamilton and Perez to stay. *Id.*

Once in their hotel room, Perez recalled that Hamilton told her, "there was just a bunch of shooting and there was glass breaking . . . [and] basically he said all hell broke loose." *Id.* at 39. Hamilton assured Perez that he did not shoot anyone, but when asked about Hank, Hamilton stated he was "not going to turn in his son." *Id.* Later that morning, Hank and Maivelett returned to pick Hamilton and Perez up from the hotel. *Id.* at 40-41. Hamilton was dropped off "on the side of the road" and Perez returned to Hamilton's house where she spoke to police. *Id.* at 40. Perez was untruthful and told police she had slept on Hamilton's boat because there was mold in the house and that she had not seen Hamilton recently. *Id.* at 40-41.

Maivelett testified that she traveled with Hamilton and Hank to Hank's stepfather's house where Hank removed the guns in the trunk of her car and put them in the garage. ECF 23-2, at 19-20. A search warrant executed on Hank's stepfather's house revealed a black bag containing three guns: a 223 caliber Marlin Firearm, a 223 caliber Smith and Wesson, and a 22 caliber Smith and Wesson. ECF 1-14, at 160-61. The latter two firearms were stipulated to at Hamilton's trial as belonging to Hank. *Id.* at 163. Ten cartridge casings recovered from an area in front of the parked

4

cars at Hamilton's residence were identified as having been fired from the 22 caliber Smith and Wesson semiautomatic rifle belonging to Hank. *Id.* at 180.

Hamilton was arrested on September 30, 2014 and interviewed by Detective Mallery. ECF 23-2, at 97. Although Hamilton's statement was not transcribed, an audiotape of his interview was played for the jury. *Id.* at 107. According to the Appellate Court of Maryland's summary of the facts, Hamilton told Mallery the following:

> [T]he driver of the car, Mr. Meran–Garcia, was a drug dealer known to him as "Fernando," who had been to his house multiple times in the past, and who he had arranged to meet that day. [Hamilton] explained that the evening of the shooting had gone awry and he did not want implicate anyone else, but he did not have a gun and had not fired a single shot. He thought the shots came from inside the vehicle towards the outside and vice versa, and said that, "I don't know who reached for what. Who did what first, I don't know. My back was to the vehicle when all this shit went down and that's the God honest truth." [Hamilton] believed "there was a misperception by someone. That, when the two misperceptions met ... one fired first, the other fired second, I don't know who."

ECF 1-6, at 5 n3. Hamilton did not testify. *Id.*

Pertinent to Hamilton's claims in this Court, Meran was interviewed by police on three separate occasions, two of which were recorded. ECF 1-15, at 4-5. Because Meran could not speak English, Detective Angel Valle accompanied Detective Mallery to Christiana Hospital to act as interpreter while Meran viewed a photo line-up. ECF 23-2, at 82. Meran identified Hamilton as the man he saw speaking with his uncle moments before his uncle was shot. *Id.* at 83.

During his testimony at trial, Meran maintained that after speaking with Meran-Garcia, Hamilton went to the porch, started sweeping, and soon thereafter, the shooting started. ECF 1-15, at 14. Defense counsel objected to Meran's testimony because the State had not provided the defense with transcripts of Meran's statements to the police, only audio recordings. *Id.* at 4-5. Counsel further explained that his request to the head of the local public defender's office to retain the services of a Spanish interpreter to translate the interviews was denied due to the estimated

cost being $3,000.00. *Id.* at 6. The trial court found that the State had complied with discovery

rules by providing audio of the interviews, overruled the defense's objection, and allowed Meran

to testify. *Id.*

On cross examination, Meran discussed three interviews he gave to police. As summarized

by the Appellate Court of Maryland, Meran stated:

> On cross-examination, Meran testified that the police came to the hospital after he was shot
> and interviewed him three times. He told police various versions of the shooting,
> including: appellant was sweeping when they first drove up, appellant walked away and
> then the shots happened, and he observed a second white male dressed in black clothes
> who began shooting. Mr. Meran initially told police that several people came out of the
> woods shooting. He clarified that he did not know how many people were shooting because
> the only person he could see well was [Hamilton] and [Hamilton] was not shooting.

ECF 1-6, at 58. Later, counsel for Hamilton attempted to play the entirety of two recordings of

Meran's recorded statements to police. ECF 1-6, at 32. At a bench conference after an objection

by the prosecutor, the trial judge limited to counsel to playing only those portions of the recordings

"relating to the statements that [Meran] made previously which differ [from the recordings]." *Id.*

at 35. The trial judge agreed with the prosecutor that Meran "admitted [to] having made [a prior]

statement" and thus concurred that playing the tapes would serve no "impeachment purposes." *Id.*

Counsel again returned to questioning Mera about his prior inconsistent statement, ending his cross

examination with the following exchange:

> Q: In your first interview you said that the defendant was sweeping when you pulled in
> the driveway. Do you recall that?
>
> A: He was sweeping.
>
> . . .
>
> Q: And then in your second interview you said that the shooting started after this gentleman
> started sweeping. Do you recall that?

6

A: Mm-hmm, yes.

Q: Just a little confused as to what the truth is. Nothing further.

*Id.* at 36-37.

At the end of the State's case, defense counsel moved for judgment of acquittal. ECF 1-15, at 77-80. The trial court granted the motion as to the first-degree and second-degree murder charges but held that there was sufficient evidence for the jury to consider the two related conspiracy counts. *Id.* at 85-86; 91-92. The trial court also granted the motion on armed robbery, conspiracy to commit armed robbery, robbery, conspiracy to commit robbery, first-degree assault, and attempted murder. *Id.* at 92-93. The jury was left to consider the following charges in their deliberations: two counts of conspiracy to commit first-degree murder, two counts of conspiracy to commit second-degree murder, and conspiracy to commit first-degree assault.

During their deliberations, the jury sent out a total of eleven notes. ECF 1-16, at 73. In response to the first ten notes, the trial court instructed the jury to rely on their collective memories of the facts and the law as supplied by the court in its instructions. *Id.* at 59-62. In response to the eleventh note asking whether intent for the purposes of assault is the same as the intent involved in self-defense, the trial court sent a pattern jury instruction on intent to the jury. *Id.* at 74. At Hamilton's request, defense counsel raised an objection to the manner in which the jury's questions were addressed, believing that the questions were not being answered by simply sending a generalized instruction on intent into the jury room. *Id.* at 78. The jury returned a guilty finding on the charge of conspiracy to commit first degree assault on Garcia-Meran and found Hamilton not guilty on the remaining charges. *Id.* at 78-80.

On June 5, 2015, Hamilton was sentenced to serve 25 years in the Department of Corrections. ECF 1-17 at 56. In imposing sentence, the trial court commented that Hamilton

would have to "serve at least one-half of the sentence" before he would be eligible for parole

consideration. *Id.*

## II.    Direct Appeal

Hamilton filed a direct appeal *pro se* in which he raised 12 claims that the Appellate Court

of Maryland chose to "combine[], rephrase[], and reorder[] as follows":

> 1.    Did the circuit court properly determine that [Hamilton] could not act as
> co-counsel at trial?
>
> 2.    Did the circuit court properly exercise its discretion in precluding
> testimony of two police officers about the termination of Officer Daniel
> Darienzo from the Elkton Police Department following his guilty plea for sexual
> offense against [Hamilton's] daughter?
>
> 3.    Did the circuit court properly exercise discretion in allowing the testimony
> of Alexander Meran without his pretrial statements having been transcribed?
>
> 4.    Did the circuit court properly exercise its discretion in denying
> [Hamilton's] motion *in limine* to prevent mention of weapons that were not
> linked by ballistics to the shooting?
>
> 5.    Did the circuit court properly exercise its discretion in allowing
> interpreters in the courtroom during the first three witnesses and in not inquiring
> whether further remedy was required after learning that the jury found the
> interpreters' presence distracting?
>
> 6.    Did the circuit court properly decline to instruct the jury on self-defense
> and defense of others?
>
> 7.    Did the circuit court properly exercise discretion in responding to jury
> notes during deliberations?
>
> 8.    Did the circuit court properly deny [Hamilton's] motion for judgment of
> acquittal in part?

ECF 1-6, at 53. The appellate court also noted that Hamilton raised two additional claims that the

court declined to address because Hamilton "did not brief or argue either question in his brief."

*Id.* at 1–2, n. 1; ECF 1-6 at 53-54, n. 1. Those two claims were stated as:

[] Did the circuit court err in disallowing the other inconsistent pretrial statements of Alexander Meran, (all of which were in Spanish) by requiring counsel to demonstrate where said Spanish statements differed?

*** .

[] Did the circuit court err in restricting the closing arguments of appellant as to self defense, by granting the State's motion *in limine* to preclude the same?

ECF 1-6, at 54 n.1.

In addressing Hamilton's claim that the trial court erred when it reversed its initial ruling that he could act as co-counsel, the Appellate Court of Maryland noted that "[t]here are only 'two types of representation constitutionally guaranteed – representation by counsel and representation *pro se* – and they are mutually exclusive.'" ECF 1-6, at 73 (quoting *Parren v. State*, 523 A.2d 597, 599 (Md. 1987)). Hamilton never asked for his counsel to be dismissed nor did he invoke his right to appear *pro se* and therefore, the court reasoned, he was "not entitled to act as co-counsel." *Id.* at 75. The appellate court agreed with the State "that the fact that the court and prosecutor did not recognize initially that the two rights are disjunctive, does not transform them into conjunctive rights" and thus held "that the circuit court did not abuse its discretion" when it denied Hamilton's request to act as co-counsel. *Id.*

Hamilton's allegations of trial court error in excluding or admitting evidence were examined by the appellate court pursuant to Maryland evidentiary rules. ECF 1-6, at 75-82. The court first cited Md. Rule 5-401, which defines relevant evidence as "'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 75 (quoting Md. Rule 5-401). The appellate court's review of the trial court's determination of evidence as relevant is a conclusion of law that the appellate court reviewed *de novo*. *Id.* The trial court's decision to admit relevant evidence that should have been excluded as unfairly prejudicial is reviewed for

9

abuse of discretion. *Id.* "[A]bsent an abuse of discretion (or an error of law), a trial court's decision to admit relevant evidence will not be reversed." *Id.* at 76.

Applying these standards to the trial court's decision to exclude testimony from Officer Darienzo and Lt. Waldridge, the appellate court found that the trial court did not abuse its discretion. ECF 1-6, at 76. The court observed that while '[b]ias is nearly always relevant," Hamilton had not presented any evidence that the proffered testimony "of a police officer charged with sex offenses that had involved [Hamilton's] daughter" was relevant to the State's prosecution of the charges against him, "particularly where the prior event took place within a different police department." *Id.* The court concluded that the trial judge "was in the best position to determine relevance and did not abuse her discretion." *Id.*

The appellate court also found that the trial court "determined correctly the relevance of Mr. Meran's testimony, and then exercised properly its discretion when it admitted Mr. Meran's testimony." ECF 1-6, at 77. It further observed that Meran's testimony, which included his recollection of Hamilton speaking with the deceased prior to the shooting, identification of Hamilton as the man he saw at the scene of the shooting, and his testimony that Hamilton returned to the house where he started sweeping the porch, "made the existence of [Hamilton's] involvement more probable than not, and as such was relevant." *Id.*

Hamilton also argued that cross-examination of Meran was made more difficult by the absence of a translated transcript of his statements to the police. ECF 1-6, at 77. He maintained that Meran had changed his story multiple times and argued that a transcript was "necessary because the officers either lied about or misinterpreted Mr. Meran's testimony from the pretrial interviews." *Id.* Initially, Hamilton attempted to prevail upon the appellate court to obtain a transcript and to compare it with the audio of Meran's statements to confirm the discrepancies. *Id.*

10

Hamilton then sought to correct the record by submitting an independent translation of Meran's statements he had obtained on his own, but the appellate court declined to consider it as it was never considered by the trial court and was not properly presented on appeal. *Id.* at 78 n.8. The appellate court rejected Hamilton's claim, observing that the trial court was "not obligated to obtain a last minute transcript of Mr. Meran's statements for defense counsel," particularly where counsel had "copies of the recordings for approximately a month and a half prior to trial and . . . never alleged a discovery violation." *Id.* at 78.

Hamilton's assertion that the trial court abused its discretion when it permitted "three assault style rifles to be admitted into evidence and then later permitted the state to display one of the rifles before the jury" was rejected by the Appellate Court of Maryland as unpreserved for review. ECF 1-6, at 79. Specifically, Md. Rule 4-323(a) "requires that the party opposed to admission object at the time the evidence is actually offered" after the trial court rules *in limine* that the evidence is admissible so that the issue is preserved for appellate review. *Id.* (citing *Washington v. State,* 990 A.2d 549, 573 (Md. App. 2010)). The narrow exception to the rule, where the trial court restates the pretrial ruling shortly before the challenged evidence is admitted, did not apply to Hamilton's case because trial counsel affirmatively stated he had no objection to the introduction of the guns. *Id.* at 80. The appellate court alternatively ruled that had the issue been preserved for review, the claim would fail on the merits "because the court admitted photographic evidence of all the weapons without objection." *Id.* at 81.

Hamilton's claim on direct appeal that he was denied due process related to: 1) the trial court's decision not to have the testimony of the first three witnesses repeated or transcribed after the jury said the presence of the interpreters in the courtroom was distracting; and 2) the trial court's denial of a request for a self-defense instruction; and 3) providing the jury with a general

11

pattern instruction on intent in response to one of its questions during deliberation. ECF 1-6, at 70, 82.

The interpreters that were present in the courtroom were there to translate for the family members of the victims who were attending the trial. ECF 1-6, at 82. Hamilton argued that permitting the interpreters to be present in the courtroom distracted the jury and, after confirming the jury members were distracted, the trial court compounded the problem because some testimony was not repeated or transcribed. *Id.* at 82-83. The appellate court rejected this claim as unpreserved for review, but also found no error by the trial court in permitting the interpreters to be in the courtroom. *Id.* at 84-85. Under Maryland law, "the victim's family members have a right, if practicable, to attend a proceeding, and the trial judge has wide discretion in the conduct of a trial." *Id.* at 84. By addressing the distraction as it did, the trial court "acted well within its discretion by making proper efforts to resolve any distraction the interpreters posed to the jury." *Id.* (citing *State v. Hawkins*, 604 A.2d 489, 493 (Md. 1992)). The failure by defense counsel to object or to offer any further argument when the trial court stated that the interpreters would be moved offsite meant that the trial court had no clear indication from the defense that another step was needed to remedy the distraction. *Id.* at 85.

Hamilton also argued that it was error and a denial of due process when the trial court refused to instruct the jury on self-defense and defense of others because, Hamilton claimed, there was sufficient evidence to support providing both instructions. ECF 1-6, at 85. This claim was also not preserved for appellate review due to the failure to offer a contemporaneous objection pursuant to Md. Rule 4-325(f). *Id.* To comply with the rule:

> [T]here must be an objection to the instruction; the objection must appear on the record; the objection must be accompanied by a definite statement of the ground for objection unless the ground for objection is apparent from the record and the

circumstances must be such that a renewal of the objection after the court instructs the jury would be futile or useless.

ECF 1-6, at 86 (quoting *Gore v. State*, 522 A.2d 1338, 1340 (Md. 1987)). Although Hamilton's counsel requested the jury instructions for self-defense and defense of others, the Appellate Court of Maryland noted that he did not "object promptly after the jury instructions, in fact stating that he had no objections." *Id.* at 87. The Court noted that "defense counsel was not merely silent after the court instructed the jury with no self-defense or defense of others instruction[,] but "[c]ounsel affirmatively stated that he was satisfied." *Id.* The appellate court went on to state that even had this claim been preserved, it would have failed on its merits because Hamilton "never conceded that he fired a gun nor did he offer any testimony to show he fired in self-defense or defense of others." *Id.* at 87. On the contrary, Hamilton told police that "he did not have a gun nor did he fire a single shot." *Id.*

The appellate court also rejected Hamilton's claim that his right to due process was also violated when the trial court provided the jury with the "Maryland Pattern Criminal Jury Instruction on intent" in response to a note inquiring about the requisite intent to establish self-defense. ECF 1-6, dat 87-88. The appellate court noted that the "'main purpose of a jury instruction is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict.'" *Id.* at 88 (quoting *Chambers v. State*, 650 A.3d 727, 729 (Md. 1994)). Hamilton disagreed with the trial court's approach because, in his view, the pattern jury instruction on intent did not provide a direct answer to the jury's question. *Id.* Under Maryland law, the decision whether to give a jury supplemental instructions in a criminal case is left to the discretion of the trial judge. *Id.* (citing Md. Rule 4-325 and *Lovell v. State*, 702 A.3d 261, 278 (Md. 1997)). In the appellate court's view, however, the evidence produced at trial did not support a theory of self-defense as explained *supra* and, therefore, the

13

trial court's use of the general instruction on intent was not an abuse of discretion and did not violate Hamilton's due process rights. *Id.* at 89.

Lastly, the appellate court addressed Hamilton's claim that the trial court "erred in denying his motion for judgment of acquittal as to the charges of conspiracy because the prosecution was essentially 'subdividing' one conspiracy into seven within the same case, thus violating double jeopardy." ECF 1-6, at 89-91. The court found that the issue was not preserved for review and, even if it had been preserved, the claim was without merit. *Id.* First, the court noted that defense counsel moved for a judgment of acquittal at the end of the State's case but failed to renew the motion at the end of all the evidence. *Id.* at 90. A motion for judgment of acquittal at the close of all the evidence in a jury trial is required by Md. Rule 4-324(a) to preserve appellate review of a sufficiency of the evidence claim. *Id.* at 89-90. Absent such a motion, the Maryland appellate courts are precluded from entertaining such a claim. *Id.*

In addition to the failure to preserve the claim, Hamilton presented a different argument on appeal than he made at trial. *Id.* Under Md. Rule 4-324(a) the "issue of sufficiency of the evidence is not preserved when appellant's motion for judgment of acquittal is on a ground different than that set forth on appeal." *Id.* at 90 (citing *Anthony v. State of Maryland*, 699 A.2d 505, 508 (Md. App. 1997)). The argument advanced to the trial court was that there "was no evidence of a meeting of the minds or even any specific identification of [Hamilton's] alleged co-conspirators." *Id.* at 91. On appeal, Hamilton argued double jeopardy, an argument the appellate court found was without merit because the "State acknowledged that the conspiracies would have merged for the purposes of sentencing had the jury convicted [Hamilton] of more than one conspiracy," but, the court correctly noted, Hamilton was convicted of only one count of conspiracy. *Id.*

**III.    Post-Trial Motions to Correct Illegal Sentence**

Hamilton filed five motions to correct an illegal sentence pursuant to Md. Rule 4-345(a), all of which were denied by the trial court. ECF 16-1, at 10-14, 17-22, 24-28, 34-42. Hamilton appealed the denial of each of his motions and the Appellate Court of Maryland consolidated the appeals into one case. *Hamilton v. State*, No. 2343, 2018 WL 904470 (Md. App. Feb. 14, 2018); ECF 1-6, at 36-50. The issues on appeal, as "rephrased by the State" and adopted by the appellate court, were as follows:

> 1.   Did the trial court properly sentence [Hamilton] for the crime of conspiracy to commit first-degree assault, notwithstanding that he had been acquitted of conspiracy to commit robbery with a deadly weapon and other offenses?
>
> 2.   Should this Court decline to consider the significance of the trial court's comment, at sentencing, that [Hamilton] would serve at least half of his sentence, pursuant to statute?
>
> 3.   Did the trial court properly sentence appellant for conspiracy to commit first-degree assault, notwithstanding his assertion that he is innocent?

ECF 1-6, at 37.

In reaching the conclusion that the circuit court committed no error in denying Hamilton's motions, the appellate court first addressed Hamilton's double jeopardy claim. ECF 1-6, at 43. Hamilton claimed that he was improperly sentenced for the crime of conspiracy to commit first-degree assault because, before the jury received the case for deliberation, the trial court acquitted him on charges of armed robbery, conspiracy to commit armed robbery, second-degree murder, and conspiracy to commit second-degree murder. ECF 1-6, at 40. In Hamilton's view, the indictment did not sufficiently detail what conduct amounted to assault in the first degree and the evidence presented at trial focused on a theory of an alleged armed robbery or murder by ambush. *Id.* Hamilton argued that "his conviction of conspiracy to commit assault is a lesser included offense of both armed robbery and second-degree murder." *Id.* Because he was acquitted of both

15

armed robbery and second-degree murder, Hamilton claimed that his conviction of conspiracy to commit first-degree assault is "an inconsistent verdict, and therefore he was sentenced improperly in violation of the prohibition against double jeopardy" making his sentence illegal.[5] *Id.*

The Appellate Court of Maryland first noted that Md. Rule 4-345(a) "allows a limited exception to the general rule of finality and permits a court to correct an illegal sentence at any time" but provides "only a narrow exemption to the preservation requirement." ECF 1-6, at 43 (citing *Chaney v. State*, 918 A.2d 506, 510 (Md. 2007)). Specifically, an illegal sentence is "limited to those situations in which the illegality inheres in the sentence itself, *i.e.*, there either has been no conviction warranting any sentence for the particular offense or the sentence is not a permitted one for the conviction upon which it was imposed and, for either reason, is intrinsically and substantively unlawful." *Id.* at 44 (quoting *Chaney*, 918 A.2d at 510). When the alleged illegality is based on "any other deficiency," it may be grounds to vacate the sentence on appeal, but it cannot be challenged through a motion pursuant to Md. Rule 4-345(a). *Id.* "Protections against double jeopardy prohibit (a) successive prosecutions for the same offense, and (b) multiple punishments for the same offense." *Id.* at 44 (citing *Ingram v. State*, 947 A.2d 74, 83 (Md. App. 2008)).

The appellate court reasoned that in Hamilton's case, there were no successive prosecutions. ECF 1-6, at 43. Even if there were, the court held that while a claim of "multiple sentences in a single prosecution is one in which the illegality inheres in the sentence itself, there are no multiple sentences here as [Hamilton] was sentenced on one count only." *Id.* (citing *Britton*

---

[5] While this case was pending, Hamilton successfully challenged the legality of his 25-year sentence, but the Appellate Court of Maryland found that his sentence was illegal for a different reason than the one argued here. *See* ECF 26-1. The basis of the decision is explained in more detail below.

*v. State*, 30 A.3d 236, 238 (Md. App. 2011)). Thus, Hamilton's double jeopardy claim was not

properly raised in a motion to correct illegal sentence. ECF 1-6, at 45. The appellate court went

on to note that had the claim been properly raised, it would fail on the merits. *Id.*

> Sentences for first-degree assault will often merge into sentences for robbery
> with a deadly weapon. *See, e.g., Morris v. State*, 192 Md. App. 1, 7-8 [993 A.2d
> 716, 720] (2010). The reverse, however, is not true. Appellant could have
> committed an assault with a firearm without having the intention to take and
> carry away the personal property of another. Similarly, he could have been
> convicted of conspiracy to murder decedent even though he was acquitted of the
> murder. Conspiracy to commit murder and murder are two separate offenses.
> In both instances appellant was convicted of the lessor offense. Therefore,
> merger does not apply and there is no double jeopardy violation here.
>
> Appellant appears to argue also that the division of one conspiracy into multiple
> conspiracies violates double jeopardy when an individual is acquitted of all the
> conspiracies except one. We addressed this issue in *Hamilton v. State*, No. 736,
> Sept. Term 2015 (filed 2018). There, we held that because the jury convicted
> appellant of only one count of conspiracy, there is nothing to merge or vacate,
> and this argument is without merit. Our view is no different here.

ECF 1-6, at 46.

Hamilton's claim regarding the trial judge's comment at sentencing that Hamilton would

be required to serve 50% of his sentence prior to parole eligibility was also rejected by the appellate

court. ECF 1-6, at 47. The sentencing court referred to Md. Code Ann., Md. Code Ann., Corr.

Servs. § 7-301(c)(1)(i), which requires any person who is convicted of a violent crime to serve

one-half of the sentence before they may be considered for parole. *Id.* However, conspiracy to

commit first-degree assault does not "meet the statutory requirement of a crime of violence." *Id.*

at n. 4, *see also* Md. Code Ann., Crim. Law § 14-101(a). Regardless, the erroneous statement

made by the sentencing court was not included on Hamilton's commitment order and therefore the

appellate court noted that it had no effect on Hamilton's sentence. ECF 1-6, at 47.

Lastly, the appellate court rejected Hamilton's claims implicating the merits of the

underlying conviction, *i.e.*, that the evidence did not support a finding of guilt, because those

claims were not properly raised in a motion to correct illegal sentence. ECF 1-6, at 49. As with Hamilton's first claim, Maryland law does not permit a challenge of this sort through a motion to correct illegal sentence as the illegality does not inhere in the sentence itself. *Id.*

While this case has been pending in this Court, Hamilton successfully appealed the Circuit Court's denial of his Motion to Correct Illegal Sentence. *Hamilton v. State*, No. 2343, 2018 WL 904470 (Md. App. Feb. 14, 2018); ECF 26-1, at 1-12. The Appellate Court of Maryland reversed the circuit court's denial and remanded the case for a new sentencing. ECF 26-1, at 2. The Appellate Court found error in the trial court's response to one of the notes sent out by the jury asking for clarification on "rules for conspiracy and degrees." *Id.* at 4. The trial court sent a summary of the instructions, which the court reassured the parties tracked the instructions provided to the jury earlier. *Id.* "But," as the appellate court noted, "it turn[ed] out that the summary didn't track the instructions the court had given orally – it tracked the *pattern* instruction, which separate[d] the two modalities of first-degree assault with the disjunctive 'or,' not the conjunctive 'and. *Id.* (emphasis in original). The court further found that the conspiracy to commit armed robbery charge and the conspiracy to commit first-degree assault charge were predicated upon the same events. *Id.* at 8. However, the appellate court held that it could not be discerned whether the jury found Hamilton guilty of conspiracy to commit first-degree assault under the firearm modality or the intent modality "because th[e] jury was given different instructions at different times." *Id.* at 10. This mattered because a conspiracy to commit first-degree assault merges into conspiracy to commit armed robbery if the State "relied on the 'firearm' modality to prove first-degree assault." *Id.* at 9. If the State relied on the *intent* modality, however, the conspiracy to commit first-degree assault "is not a lesser-included offense of armed robbery." *Id.* Here, the trial court's incorrect instruction to the jury, and the later conflicting instruction, made it unclear which

18

modality was the basis for the conviction. *Id.* And if the conspiracy to commit first-degree assault merged with the armed robbery, Hamilton could have only been sentenced to 20 years, the maximum sentence allowed for robbery, instead of the 25 years he received. *Id.* at 11-12. Accordingly, Hamilton's sentence was vacated and he was resentenced on December 12, 2023 to 20 years in custody. *See State v. Hamilton,* Case No. 07-K-14-001735 (Cecil Co. Cir. Ct.), available at http://casesearch.courts.state.md.us/casesearch/ (last viewed September 16, 2024).

### IV.   Motion to Strike Judgment

On August 30, 2016, Hamilton filed a "Motion to Strike Judgment Obtained by Evidence Fabrication and Demand for Appropriate Relief" in the Circuit Court for Cecil County. ECF 16-1, at 100-106. Hamilton filed another similar motion on September 18, 2016. *Id.* at 130-38. Both motions were denied by marginal order dated October 26, 2016. *Id.* at 106, 137. Hamilton alleged in each motion that the State used fabricated evidence to convict him. ECF 16-1, at 103, 132. Hamilton noted that the State's claim at trial was that Hamilton conspired with his son to ambush Meran-Garcia and Meran and the State relied on a translated statement by Meran to support that theory. *Id.* Specifically, the State maintained that Meran said that Hamilton returned to the porch and began sweeping after speaking with Meran-Garcia in his car. *Id.* The act of Hamilton sweeping his porch was portrayed as a "signal" to Hamilton's son to open fire. *Id.*[6]

Hamilton procured a translation of Meran's statement to the police which Hamilton contends differed from the testimony Meran presented at trial. In the newly-translated statement Meran said, "when they finished talking [Hamilton] went back to the house, then I lost sight of

---

[6] In closing, the State argued that after Hamilton spoke to Meran-Garcia at the car, Hamilton "back[ed] up, pick[ed] up a broom and start[ed] sweeping [and] the next thing [Mr. Meran] knows [is] bullets are coming from the right." ECF 1-16, at 27. The sweeping was referenced by the state as "a signal." *Id.* at 28 ("The defendant checked to make sure everything was ready before he backed up to give the signal. Bullets start flying.").

him, that's where the shooting started." ECF 16-1, at 147. Later during an interview in which Detective Valle acted as a translator for Meran, Meran allegedly stated that "[t]he guy came down, they had the conversation. Next thing you know [Hamilton] goes up, starts sweeping again." *Id.* at 152. During the trial Meran testified that Hamilton went back to the house after talking with Meran-Garcia and started sweeping, then the gunfire started. ECF 1-15, at 14.

In his motions to strike, Hamilton stated that his attempts to have Meran's statement translated prior to and during trial were denied by both the State's Attorney's Office and the Office of the Public Defender. ECF 16-1, at 102-103; 131-32. Because Hamilton does not speak Spanish, he alleges that he could only rely on the representation of what Det. Valle claimed Meran had said during the interview for purposes of identifying any inconsistent statements. *Id.* at 132. After the trial, Hamilton paid for his own translation of the interview and claims that he then determined that "Valle misrepresented the statement of Alexánder Meran in claiming that [Meran] stated during the audio and video recorded interview that he witnessed [Hamilton] 'start sweeping again" immediately before the shooting. *Id.* at 103, 133. Hamilton also argued that the manner in which Meran was interviewed and the representations as to what Meran said during the interview caused false evidence to be presented at trial and denied Hamilton the right to meaningfully cross-examine the witness. *Id.* at 135.

In addition, Hamilton faults Valle for attempting to "assist the witness in exaggerating his reasons . . . for [Meran's] illegal immigration by claiming falsely . . . that [Meran's] father had government secrets, and that ICE verified the information" and that Meran was released from ICE custody to his uncle so that he could be protected. *Id.* at 133. Hamilton alleges that this "statement [] was never made during the interview." *Id.* Hamilton alleges that Valle and his fellow officers suborned perjury by promising Meran they would check on him weekly and would ensure his

safety, promises made to induce testimony favorable to the State at Hamilton's trial. *Id.* at 133-34.

Although his motions were initially denied, the circuit court held an evidentiary hearing after Hamilton filed a motion for reconsideration. ECF 1-5, at 2-124. Following a hearing, the circuit court denied Hamilton's motion to strike by memorandum dated April 26, 2017, because the court was "unable to find that Defendant was denied a fair and impartial trial." ECF 16-2, at 36-40. More specifically, the court found that police and prosecutors had no "obligation to translate the statement of a Spanish speaking witness and then provide a transcript of that statement to the Defendant." *Id.* at 39. Plus, even if discrepancies existed between the initial interpretation of Meran interview by Valle and Hamilton's self-financed transcript, this did not amount to "extrinsic fraud" required to set aside the judgment. *Id.* The circuit court rejected the remainder of Hamilton's arguments as well and Hamilton appealed the ruling to the Appellate Court of Maryland. ECF 16-2, at 69, *Hamilton v. State*, No. 473, 2018 WL 2970775 (Md. App. June 12, 2018); ECF 1-6, at 95-104.

In affirming the lower court's ruling, the appellate court first noted that because Hamilton's motion was filed "more than 90 days after the imposition of sentence, but before disposition of his direct appeal," relief could only be granted if there was either "1) 'fraud,' pursuant to Maryland Rule 4-331(b); or 2) 'newly discovered evidence,' pursuant to Maryland Rule 4-331(c)." ECF 1-6, at 98-99. In the appellate court's view, "Hamilton's motion fails under either ground." *Id.* The type of fraud required for relief is "extrinsic fraud" which is defined as fraud that is "collateral to the issues in the case and 'actually prevents an adversarial trial.'" ECF 1-6, at 99 (quoting *Pelletier v. Burson*, 73 A.3d 1180, 1184 (Md. App. 2013)). The Appellate Court of Maryland assumed without deciding that "Deputy Valle's summary of Meran's statements constituted a 'fraud'" but

21

was "not persuaded that the circuit court erred in determining that said fraud was intrinsic rather than extrinsic." *Id.* at 100. The court reasoned that Valle's summary of Meran's statements was not presented at trial; rather, Meran provided direct testimony implicating Hamilton. *Id.* Meran was cross-examined by defense counsel regarding various inconsistent statements he made to police. *Id.* at 101. As such, Meran's "credibility vis-a-vis his statements to the police was presented to the jury." *Id.*[7]

The appellate court further found that "Hamilton's evidence is not 'newly discovered'" because under Maryland law, "'newly discovered' evidence must not have been discovered, or been discoverable by the exercise of due diligence, within ten days after the jury has returned a verdict." ECF 1-6, at 101 (citing *Argyrou v. State*, 709 A.2d 1194, 1200-01 (Md. 1998)). The court then noted:

> Here, the record shows that Hamilton had access to the recordings of Meran's statements prior to trial and could have had them transcribed then. Although Hamilton claims that he submitted requests to the State and the Office of the Public Defender to have the records transcribed, we are not persuaded that those efforts constituted "due diligence." Clearly, having the recordings transcribed by a third-party was not an impossibility, as Hamilton did just that in preparation for his motion to strike. Hamilton has provided no explanation as to why he did not pursue that option in time to move for a new trial pursuant to Rule 4-331(a). Accordingly, Hamilton has failed to meet his burden of due diligence.

ECF 1-6, at 101-102. The appellate court also rejected the remainder of Hamilton's claims. *Id.* at 102. Specifically, the circuit court's erroneous cite to Md. Rule 2-535, rather than Md. Rule 4-331, both of which deal with fraud, was "inconsequential, as 'the words fraud, mistake or irregularity mean the same thing in Rule 4-331(b) as in Rule 2-535(b).'" *Id.* (quoting *Minger v.*

---

[7] In his closing at trial, Hamilton's counsel stressed that Meran had "changed his story" multiple times during his interviews with police. ECF 1-16, at 42 "It goes back to the old adage[:] [i]t's hard to keep lies straight, particularly when you're interviewed by the police three times, and you changed your story each time. And then you get on the stand under oath . . . and you do a conglomeration of all four.").

*State*, 849 A.2d 1058, 1067 (Md. App. 2004)). The circuit court's limitation on Hamilton's cross-examination of a witness during the hearing on his motions to strike was not an abuse of discretion in light of the court's finding that "the two questions at issue [were] argumentative and more appropriate for the argument portion of the hearing." *Id.* "Lastly, Hamilton's assertion that transcripts of Meran's interviews somehow existed prior to trial was directly refuted by the State, which, during the hearing, stated that no such transcripts existed." *Id.*

## V.    State Post-Conviction Proceedings

On January 17, 2017, Hamilton filed a petition for post-conviction relief, raising numerous grounds for relief. ECF 16-2, at 11-34. On December 11, 2018, Hamilton supplemented his first petition with a second. *Id.* at 298-330. The post-conviction court addressed Hamilton's claims following a hearing that was held on January 18, 2019. ECF 1-4. The claims Hamilton raised concerned ineffective assistance of counsel, prosecutorial misconduct, and trial court error.

Hamilton's numerous claims of ineffective assistance of counsel alleged that trial counsel failed to: investigate and make an appropriate motion as to agents of the prosecution recording attorney-client phone calls held between Hamilton and his attorney when Hamilton was confined to the Cecil County Detention Center; investigate the pretrial statements of Meran and to have the statements translated; renew an objection raised by a motion in limine regarding the introduction of firearms and photographs of firearms not linked to the crime thereby failing to preserve the issue for appeal; proffer expected testimony of witnesses Daniel Darienzo and Lt. Larry Waldridge of Elkton Police, who Hamilton sought to call as witnesses for the defense; argue a motion for judgment of acquittal at the close of all evidence; object to trial court's failure to rule on an objection by Hamilton regarding questions posed by the jury; object to an inconsistent verdict of the jury; object to the trial court's remark regarding a requirement for Hamilton to serve one-half

of his sentence before he was eligible for parole; object to the trial court's failure to provide an order denying Hamilton's motion to correct his illegal sentence; consult Hamilton prior to filing pleadings, thus depriving Hamilton of the opportunity to present an argument regarding double jeopardy; investigate evidence of local law enforcement bias to counter the State's argument to exclude testimony regarding Daniel Darienzo's sexual assault of Hamilton's daughter; object to the manner in which the trial court provided jury instructions, thereby permitting the court to withhold the written instructions and allowing the selective provision of one instruction which allowed an invasion into the province of jury deliberations; conduct a voir dire of the jury to determine if, after having been distracted by interpreters, they needed testimony repeated; offer evidence provided by the State during discovery that tended to show there was a transcript of Meran's pretrial statement; conduct pretrial investigation into the alleged existence of a transcript of Meran's pretrial statement; raise all arguments in support of the motion for judgment of acquittal including Hamilton's double jeopardy claim that the conspiracy charges were illegally subdivided, that the jury should receive an instruction on "hot blooded response to legally adequate provocation," and manipulation of Meran's statement by Valle; obtain an English translation of Meran's statement; investigate Meran's statements to police beyond a cursory review which prejudiced Hamilton's ability to uncover evidence of manipulation of the statement by law enforcement; investigate the statements of witnesses beyond the police reports; object to the trial court's refusal to provide a self-defense/defense of others instruction; present evidence of malice by the decedent toward Hamilton; obtain or request a trajectory expert for the shots fired into Hamilton's home; advise Hamilton that a translator for Meran's pretrial statements had to be court-certified; file a motion, despite promising to do so, regarding the ability to have the pretrial statements of Meran translated; seek further remedial action after the Office of the Public Defender

24

denied payment for a translation of Meran's statements; properly advise Hamilton to testify so Hamilton could clarify his statements made to police and produce evidence to support self-defense/defense of others and/or "hot-blooded response to legally adequate provocation"; introduce photographs of additional shell casings found at the scene to establish the veracity of Hamilton's statement to the police that shots had been fired at his home and that he heard two different calibers being fired; present evidence of the lighting conditions at the scene; present evidence of an additional party being on the scene as evidenced from statements of Natalee Chambers and Corporal Brian Soler; call Natalee Chambers as a witness to testify she deleted the contents of her phone and to establish the existence of another party in the car with Jose Figueroa; present evidence of a traffic stop involving the decedent by New Castle County Police weeks prior to the incident which Hamilton stated was part of the motive of malice from the decedent toward Hamilton; obtain an independent review of the medical examiner's conclusion that "pseudo stippling" was seen on decedent's skin; file a motion regarding discovery violations; request a formal independent translation of Meran's pretrial statement by motion filed with the trial court; call witnesses supportive of Hamilton's innocence or to interview witnesses; provide discovery materials to Hamilton in sufficient time before trial so Hamilton could make requests of the Office of the Public Defender to rebut the evidence provided by the State; and to question witnesses about the failure to test clothing items worn by Meran and Meran-Garcia for gunshot residue to establish close range firing inside the car. ECF 1-6, at 2-7.

Hamilton also alleged ineffective assistance by appellate and post-conviction counsel. He claimed appellate and post-conviction counsel rendered ineffective assistance by refusing to obtain an independent translation of Meran's pretrial statements, which delayed Hamilton's ability to present the evidence of a false translation. ECF 1-6, at 5, 7. Hamilton premised his ineffective

assistance of appellate counsel claim on counsel's agreement to postponements requested by the

State without Hamilton's consent and contrary to Hamilton's stated wishes. ECF 1-6, at 7. He

claimed post-conviction counsel rendered ineffective assistance because, after conducting a full

review of Hamilton's case, counsel sought a postponement and later abandoned Hamilton's case,

which Hamilton alleges required appointment of another public defender. *Id.* at 7. Hamilton also

alleges that his post-conviction counsel failed to review his case, advised Hamilton to discharge

counsel, and told Hamilton that the average postponement of post-conviction cases in "3-5 years."

*Id.* Hamilton alleges these factors forced him to proceed *pro se* in his post-conviction proceedings.

*Id.*

Hamilton also asserted claims of prosecutorial misconduct or error. He alleged that the

prosecutor provided false translations of statements during discovery and "fabricated witness

statements," effectively concealing exculpatory evidence disproving the existence of a conspiracy,

prejudicing the cross-examination and confrontation rights of Hamilton, and concealing evidence

of bias by local law enforcement. ECF 1-6, at 8-9. Hamilton alleged that the prosecution erred by

noting in discovery documents that a "transcript" of Meran's first and second interviews with

police existed, even though these interviews were only audio recorded. *Id.* at 7. This mislead

defense counsel and Hamilton into believing that actual transcripts of the statements existed, only

to have the State then deny their existence at trial when counsel requested them. *Id.* Hamilton

alleges that the prosecutor acted improperly in refusing to provide a translated and transcribed

version of the Spanish-language statements and, instead, provided only the "false translation"

produced when Det. Valle translated Meran's statements. *Id.* Hamilton further claimed that State

agents and prosecutors "knowingly and intentionally intercepted and listened to, without a warrant

or court order to do so, the attorney client calls" between Hamilton and his counsel, and when

prosecutors were made aware of the issue, they did nothing to prevent it. *Id.* Hamilton alleged that the Cecil County Sheriff's Office and Detective Mallery withheld evidence of additional instances of intercepted privileged communications between Hamilton and his counsel and prejudiced Hamilton's ability to present the issue to the court. *Id.* Hamilton claimed that former State's Attorney Edward D.E. Rollins and Assistant State's Attorney Kevin Urick refused to provide discovery materials directly to Hamilton, thereby hampering his ability to review the material before trial and to obtain expert witnesses. *Id.* Hamilton further alleged that "[t]he prosecution presented false information in pleadings before the Court in response to [Hamilton's] motion to strike judgment." *Id.* Hamilton alleged that prosecutors improperly interviewed counsel for Hank Hamilton and falsely advised Hank that Hamilton "had engaged in plea negotiations and intended to provide testimony against him as part of negotiations which never occurred, to attempt to elicit trial testimony against [Hamilton]." *Id.*

Hamilton also raised two claims asserting trial court error. Hamilton claimed he was denied a fair trial because the court initially failed to provide the jury with written jury instructions, only to provide them later on the sole issue of intent, and then only after the jury asked a question. ECF 1-6, at 9. Hamilton also alleged that the trial court placed "undue emphasis on isolated specific instructions (i.e. the intent instruction) and invaded the province of juror deliberations by instructing the jury in a non-neutral manner to essentially disregard reasonable inferences from the evidence." *Id.* Additionally, Hamilton alleged the trial court erred when it did not provide for a remedy or a sanction after learning that the sheriff's office was recording calls between Hamilton and his trial attorney. *Id.*

The post-conviction court denied relief in a Memorandum Opinion and Order dated August 12, 2019. ECF 1-6, at 2-34. Hamilton filed an application for leave to appeal the denial of post-

27

conviction relief, which was summarily denied. *Hamilton v. State of Maryland*, No. 1918 (Md. Ct. Spec. App. July 10, 2020), ECF 1-3, at 2-3. Hamilton's Motion for Reconsideration of the denial of his application for leave to appeal, *id.* at 4-8, was denied on July 31, 2020, ECF 3-1, at 98.

## VI.   Federal Habeas Claims

Hamilton generally claims that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated and attempts to incorporate into his federal habeas petition all claims raised in all State court proceedings.[8] ECF 1, at 9-20. "While each § 2254 petition must contain the overarching assertion of custody in violation of federal law, it must also contain specifically 'asserted grounds for relief,' otherwise termed as 'issues' or 'claims.'" *Folkes v. Nelsen*, 34 F.4th 258, 267–68 (4th Cir. 2022) (quoting *Samples v. Ballard*, 860 F.3d 266, 273 (4th Cir. 2017)). "Both AEDPA and the Rules Governing Section 2254 Cases in the United States District Courts provide that different grounds for relief are treated as different claims, *Samples*, 860 F.3d at 274, and that petitioners must "state the facts supporting each ground," *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Habeas Corpus R. 2(c))." *Id.* This Court will therefore only address the claims that Hamilton has adequately stated in his § 2254 Petition and will not peruse the entire record to address the more than fifty claims he raised in various State courts but fails to adequately raise here.[9]

---

[8] Hamilton states in part that he "hereby adopts and incorporates for this Court's consideration, all arguments and issues as were presented to the trial court, motion to strike judgment court, motion to correct illegal sentence court . . and all issues as were presented to the [Appellate Court of Maryland] in cases Nos. 736, 2343, and 0473 . . . ." ECF 1, at 9. He additionally purports to incorporate all issues raised in post-conviction proceedings and in petitions for writ of certiorari that he filed with the Maryland Court of Appeals, now the Supreme Court of Maryland. *Id.*

[9] Even if all of Hamilton's claims were considered on their merits, he would not be entitled to relief. This Court gives "considerable deference to the state court decision," and may not grant

In his Petition, Hamilton asserts the trial court erred when it: denied his request to act as co-counsel, ECF 1, at 10; allowed Meran to testify without providing the defense with a transcript of Meran's statement to the police, *id.* at 11, 12; excluded evidence of bias by local law enforcement, *id.*; and allowed evidence of firearms not connected with the crime to be introduced at trial, *id.* at 11-12. He alleges the appellate courts erred when they: affirmed the decision to allow firearms evidence; reworded Hamilton's issues on appeal; denied Hamilton's claim that the verdict was inconsistent; and found that Hamilton did not exercise due diligence in obtaining an independent translation of Meran's statement. *Id.* at 15-16. He claims that both the trial and appellate courts erred when the evidence offered at the motion to strike judgment hearing was not analyzed as a discovery violation. *Id.* at 16. He also claims the Office of the Public Defender delayed pursuing a direct appeal, forcing Hamilton to proceed *pro se* on his direct appeal. *Id.* at 15. Hamilton assigns error to the post-conviction court when it: refused to consider many claims it deemed finally litigated on appeal; permitted trial counsel to disobey a subpoena requiring him to appear at the hearing with all trial records; did not ensure other subpoenas were properly served, resulting in key witnesses being absent from the proceedings; and relied on unpublished opinions to support a conclusion that certain claims were finally litigated. *Id.* at 16-20. Hamilton also claims the prosecution improperly and illegally subdivided a single count of conspiracy into seven separate counts, giving the jury "multiple bites of the apple." *Id.* at 20.

---

habeas relief unless the state court arrived at a "'decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Nicolas v. Att'y Gen. of Md.*, 820 F.3d 124, 129 (4th Cir. 2016) (quoting 28 U.S.C. § 2254(d)). This Court has carefully reviewed the record in this case and finds that Hamilton has not made such a showing.

Respondents assert in their Second Supplemental Response that Hamilton's claims are not cognizable grounds for federal habeas relief, procedurally defaulted, or otherwise meritless. ECF 16, at 25-135. Hamilton's claims are addressed below.

## STANDARDS OF REVIEW

### I.   Cognizability

A federal petition for a writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *see also Wilson v. Corcoran*, 562 U.S.1, 1 (2010) ("Federal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law."); *Young v. Warden, Md. Penitentiary*, 383 F. Supp. 986, 1009 (D. Md. 1974) ("It is axiomatic that only the violation or denial of some federal constitutional right, and not alleged errors in the interpretation or application of state law, can be the basis for federal habeas corpus relief."), *aff'd*, 532 F.2d 753 (4th Cir. 1976); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (citations omitted).

### II.   Deferential Review

The federal habeas statute sets forth a highly deferential standard for evaluating state court rulings under which state court decisions are to "be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see also Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). The standard is "difficult to meet." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citation omitted); *see also White v. Woodall*, 572 U.S. 415, 419–20 (2014) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement") (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A federal court may not grant a writ of habeas corpus unless the state court's adjudication on the merits: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). A state court's adjudication is contrary to clearly established federal law under § 2254(d)(1) when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (citation omitted). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "For an 'application of federal law' to be 'unreasonable,' it must be 'objectively' so." *Mahdi v. Stirling*, 20 F.4th 846, 892 (4th Cir. 2021) (quoting *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020)). "To qualify, the state court must 'correctly identif[y] the governing legal principle from the Supreme Court's decisions but unreasonably appl[y] that principle to the facts of the particular case.'" *Id.* (quoting *Tyler v. Hooks*, 945 F.3d 159, 166 (4th Cir. 2019)).

"[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). The state court's application of federal law must be "objectively unreasonable." *Id.*

31

(quoting *Williams*, 529 U.S. at 409). Furthermore, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation omitted). The fact that "reasonable minds reviewing the record might disagree about the finding in question" is not enough to deem a state court's factual determination unreasonable. *Id.* "[D]eterminations of facts are 'unreasonable' when they are '"sufficiently against the weight of the evidence."'" *Mahdi*, 20 F.4th at 892 (citing *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019) (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010))). A "state court's factual determinations are presumed correct, and the petitioner must rebut this presumption by clear and convincing evidence." *Bennett v. Stirling*, 842 F.3d 319, 322 (4th Cir. 2016).

## III.     Exhaustion

A petitioner seeking habeas relief in federal court must first properly exhaust the remedies available in state court. 28 U.S.C. § 2254(b)(1)(A); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court."). This requirement is satisfied by seeking review of the petitioner's claims in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(c). For a person convicted of a criminal offense in Maryland, exhaustion may be accomplished either on direct appeal or in post-conviction proceedings. To exhaust claims on direct appeal in non-capital cases, a defendant must assert them in an appeal to the Appellate Court of Maryland and then to the Supreme Court of Maryland by way of a petition for a writ of certiorari. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-201, 12-301. To exhaust claims through post-conviction proceedings a defendant must assert them in a petition filed in the Circuit Court where the inmate was convicted within 10 years of the date of sentencing. *See* Md. Code Ann., Crim.

Proc. §§ 7-101 to 7-103. After a decision on a post-conviction petition, further review is available

through an application for leave to appeal filed with the Appellate Court of Maryland. *Id.* at § 7-

109. If the Appellate Court of Maryland denies the application, there is no further review available

and the claim is exhausted. Md. Code Ann., Cts. & Jud. Proc. § 12-202. If the application is

granted, but relief is denied on the merits of the claim, a petitioner must file a petition for writ of

certiorari to the Supreme Court of Maryland. *See Williams v. State*, 438 A.2d 1301, 1304-05 (Md.

1981).

## IV.    Procedural Default

"[A] federal habeas court may not review constitutional claims when a state court has

declined to consider their merits on the basis of an adequate and independent state procedural

rule." *Burket v. Angelone*, 208 F.3d 172, 183 (4th Cir. 2000). "State courts may not avoid

deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all

similar claims." *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982). For a state procedural bar to be

adequate, it must be based on a rule that "is regularly and consistently applied by the state court."

*Yeatts v. Angelone,* 166 F.3d 255, 260 (4th Cir. 1999); *see also Johnson v. Lee*, 578 U.S. 605, 608

(2016) (state procedural rule is adequate to preclude federal habeas review if it is "firmly

established and regularly followed"). "Whether a state procedural rule is adequate to preclude

federal review is a question of federal law." *Woodfolk v. Maynard*, 857 F.3d 531, 543 (4th Cir.

2017) (citing *Beard v. Kindler*, 558 U.S. 53, 60 (2009)). A state's contemporaneous objection rule

is an adequate and independent state ground. *See Wainwright v. Sykes,* 433 U.S. 72, 85 (1977)

(holding that a federal habeas petition who failed to comply with a state's contemporaneous

objection rule must show cause for the procedural default to obtain habeas review); *Murray v.

Carrier*, 477 U.S. 478, 485-92 (1986) (same); *Lowe v. Dovey,* Civ No. SAG-20-3429, 2023 WL

131042, at *5 (D. Md. Jan. 9, 2023) (finding that Maryland's contemporaneous objection rule is an independent and adequate state ground sufficient to bar federal habeas review).

When a state prisoner's habeas claim has been procedurally defaulted, a federal court may not address the merits of the claim unless the petitioner can show both "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir. 1998). "Cause" consists of "some objective factor external to the defense" that "impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S at 488. To demonstrate prejudice, the petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original); *see also Murray*, 477 U.S. at 494. In addition, a petitioner may obtain review of procedurally defaulted claims if the case "falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (alteration in original)); *Coleman*, 501 U.S. at 750 (holding that procedural default may be excused if the failure to consider the claims will result in a "fundamental miscarriage of justice") (quoting *Murray*, 477 U.S. at 495)). Such cases are generally limited to those for which the petitioner can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. To be credible, "a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998).

## V.   Effective Assistance of Counsel

34

The Sixth Amendment to the United States Constitution affords a criminal defendant the right to "Assistance of Counsel." U.S. Const. amend. VI. The Supreme Court has stated that "assistance which is ineffective in preserving fairness [of a trial] does not meet the constitutional mandate." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). A petitioner alleging ineffective assistance of counsel in violation of the Sixth Amendment must ordinarily meet the standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this standard, the petitioner must show both deficient performance and prejudice—that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.* at 687, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

On the issue of deficient performance, a defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). "Judicial scrutiny of counsel's performance must be highly deferential" and not based on hindsight. *Strickland*, 466 U.S. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Under the Sixth Amendment, a defendant "has a right to effective representation, not a right to an attorney who performs his duties 'mistake-free.'" *Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006)).

On the issue of prejudice, "[t]he essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman*, 477 U.S. at 374. Thus, in order to prevail, the petitioner must show "that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at

35

375. A determination whether the attorney's performance was deficient need not be made if it is clear that there was no prejudice. *See Strickland*, 466 U.S. at 697.

"The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## ANALYSIS

### I.    Trial Court Error

Hamilton's claim that his request to act as co-counsel was improperly denied was addressed by the Appellate Court of Maryland when it noted that "[t]here are only 'two types of representation constitutionally guaranteed – representation by counsel and representation *pro se* – and they are mutually exclusive.'" ECF 1-6, at 73 (quoting *Parren*, 523 A.2d at 599). Hamilton was not permitted to pursue both self-representation and representation by counsel under the Sixth Amendment. *Parren*, 523 A. 2d at 599 ("In short, '[a] criminal defendant does not have an absolute right to both self-representation *and* the assistance of counsel.'") (quoting *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir.1981) (emphasis in *Halbert*)). The record reflects that Hamilton did not request to discharge trial counsel, nor did he invoke his right to represent himself at trial. As such, the State court's analysis is without error and survives scrutiny under the deferential standard for federal habeas corpus review.

Hamilton asserts that the trial court erred in excluding evidence of police bias when it would not allow the defense to introduce evidence concerning a separate sexual assault case involving his daughter's accusation against an Elkton police officer. ECF 1, at 11. The trial court

36

granted the State's motion *in limine*, preventing the defense from eliciting testimony about those accusations from Officer Daniel Darienzo, who pled guilty to sexual offenses against Hamilton's daughter, or Lt. Larry Waldridge, who was a witness in the case against Darienzo. ECF 1-6, at 17. The trial court held that the testimony was irrelevant because the Elkton police, who employed both officers, was not involved in the criminal investigation or prosecution of Hamilton. ECF 1-6, at 17; 64-65.

Hamilton next asserts that the trial court abused its discretion when it denied a defense motion *in limine* and admitted evidence of firearms that were neither possessed nor owned by Hamilton and were not tied to the offense through ballistics evidence. ECF 1, at 11, *see also* ECF 1-12 at 26-27. Although Hamilton raised this claim on direct appeal, he did not include an allegation of a federal Constitutional violation. *Hamilton*, 2018 WL 904348, at *1, *11–*12; ECF 1-6, at 53 and 63. Further, the Appellate Court of Maryland found that the claim had not been preserved for review under Maryland's contemporaneous objection rule and, had it been preserved, the trial court's ruling was "harmless beyond a reasonable doubt because the court admitted photographic evidence of all the weapons without objection" and also "ameliorated any potential for unfair prejudice when it instructed the jury that two of the long guns . . . belonged to Hank [Hamilton]." *Id.* at 12, ECF 1-6, at 81-82.

Hamilton also asserts that the trial court erred when it permitted Meran to testify at trial without requiring the State to provide a translated transcript to the defense. ECF 1, 10-11. Hamilton asserts that the evidentiary ruling was improper because the Public Defender's Office refused to pay for the translation, and he was denied a fair trial as a result because Sgt. Valle created a false translation of the statement. *Id.* at 11. The trial court's ruling on the objection raised by the defense was based on counsels' agreement that the defense was provided the

37

recordings of Meran's statements for approximately one-and-a-half months and that Meran's testimony was relevant. ECF 1-15, at 4-6.

"A state court's resolution of an evidentiary question generally does not give rise to a cognizable claim under § 2254." *Fullwood v. Lee*, 290 F.3d 663, 692 (4th Cir. 2002) citing *Hutchins v. Garrison*, 724 F.2d 1425, 1437 (4th Cir. 1983). Thus, Hamilton's claims regarding the evidentiary rulings by the trial court are not cognizable unless the trial court's exclusion of the evidence violated a Constitutional provision or were so egregious that they rendered the entire trial fundamentally unfair. *See Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6 (1983) (upholding Texas evidentiary rule permitting introduction of prior conviction at the guilt determination stage). Here, Hamilton cites no specific Constitutional provision that the trial court's rulings violated, nor did he raise such a claim in State court. As such, these claims are not cognizable.

Moreover, Hamilton has failed to show that the trial court's rulings on these claims were "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Harrington*, 562 U.S. at 103. Indeed, the record reflects that the trial court considered Hamilton's arguments and provided ample justification for its decisions. Federal habeas relief is therefore denied as to each of Hamilton's claims of trial court error.

## II.    Appellate Court Error

The Court turns next to Hamilton's claims of error by the appellate courts who reviewed his case. Hamilton's claim regarding the firearms evidence was not preserved for the State appellate courts to review. *Hamilton*, 2018 WL 904348, at *12; ECF 1-6, at 81. The Appellate Court of Maryland rejected the claim because a contemporaneous objection was not lodged during the trial when the evidence was introduced. *Id.* Thus, Hamilton's claim was rejected on an

adequate and independent state ground and as such it is procedurally defaulted and cannot be considered. *Wainwright*, 433 U.S. at 85. Additionally, because this claim concerns the application of state evidentiary law and does not identify a specific constitutional right that was violated, the claim is also not cognizable here. See 28 U.S.C. § 2254(a); *see also Wilson*, 562 U.S. at 1.

Hamilton's claim that the appellate courts reworded the issues he raised on appeal does not implicate a federal constitutional right and therefore is also without merit and not cognizable. *Id.*

Hamilton's claim that it was error for the appellate courts to affirm an allegedly inconsistent verdict was rejected on the basis of Maryland State law. Hamilton attempted to raise this claim through a motion to correct illegal sentence. The motion was not the proper vehicle, under established Maryland law, to challenge an inconsistent verdict because such a motion is reserved for correction of a sentence in which the "'illegality inheres in the sentence itself; i.e., there either has been no conviction warranting any sentence for the particular offense or the sentence is not a permitted one for the conviction upon which it was imposed.'" ECF 1-6, at 44 (quoting *Chaney v. State*, 466, 918 A.2d 506, 510 (Md. 2007)). Because the defense did not raise an objection to the alleged inconsistent verdicts, the issue was unpreserved for appellate review. Hamilton was not permitted to circumvent this by resorting to raising this issue in a motion to correct illegal sentence which provides a "narrow exemption to the preservation requirement." ECF 1-6, at 43. There is no basis for federal habeas relief on this claim.

Hamilton's asserts error in the finding that an independent translation of Meran's Spanish language statements to the police did not constitute "newly discovered evidence" under Md. Rule 4-331(c). ECF 1-6, at 101-02. To qualify as "newly discovered evidence," the evidence "'must not have been discovered, or been discoverable by the exercise of due diligence, within ten days after the jury has returned a verdict.'" *Id.* at 101 (quoting *Argyrou*, 709 A.2d at 600-01). The

Appellate Court of Maryland noted that the record in Hamilton's case established that he "had access to the recordings of [Meran's] statements prior to trial and could have had them transcribed then." *Id.* The appellate court observed that "clearly, having the recordings transcribed by a third-party was not an impossibility, as Hamilton did just that in preparation for his motion to strike." *Id.* The claim is based on the courts' interpretation of Maryland State law and does not implicate a federal constitutional claim. As such, federal habeas relief is unavailable for this claim.

Hamilton asserts that the appellate courts erred when it "failed to analyze the evidence offered at the motion to strike judgment hearing . . . as one of a discovery violation . . . ." ECF 1, at 16. Hamilton first raised this discovery-based claim on appeal and did not present the translated transcript to the trial court, nor did he claim a discovery violation before the trial court. ECF 1-6, at 78 n. 8. As such, the Appellate Court of Maryland noted that the claim was "not preserved for [its] review." *Id.* Moreover, Hamilton fails to allege the violation of a federal right associated with this claim. The record reflects that Hamilton had access to the recording of the Meran's interview prior to trial and there is no argument that the State withheld it from the defense. *Id.* ("Defense counsel acknowledged that he had copies of the recordings for approximately a month and a half prior to trial and he never alleged a discovery violation."). Importantly, the appellate court also correctly noted that defense counsel was able to effectively cross-examine Meran, highlighting the discrepancies in his testimony for the jury, and this Court's review confirms this finding. *See* ECF 1-15, at 31, 36-38.

Finally, Hamilton has not identified any Supreme Court precedent requiring the State to provide him with a free translated transcript of a witness's statement. The absence of Supreme Court precedence on the matter means that "it cannot be said that the state court 'unreasonably applied clearly established Federal law.'" *Carey v. Musladin,* 549 U.S. 70, 77 (2006), *see also*

*White v. Woodall*, 572 U.S. 415, 419 (2016) (holding that clearly established federal law under § 2254(d)(1) only includes holdings of the U.S. Supreme Court). Federal habeas relief must therefore be denied on this claim.

## III.    Post-Conviction Court Error

Hamilton assigns error to the post-conviction court for deeming many claims to be finally litigated, allegedly permitting trial counsel to disobey a subpoena, not ensuring that trial subpoenas were properly served, and relying on unpublished opinions to support its holdings. ECF 1, at 16-19. "A state prisoner has no federal constitutional right to post-conviction proceedings in state court." *Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) (citing *Lackawanna Cnty. Dist. Att'y v. Coss*, 532 U.S. 394, 402 (2001)). Therefore, "even where there is some error in state post-conviction proceedings, a petitioner is not entitled to federal habeas relief because the assignment of error relating to those post-conviction proceedings represents an attack on a proceeding collateral to detention and not to the detention itself." *Lawrence*, 517 F.3d at 717; *Wright v. Angelone*, 151 F.3d 151, 159 (4th Cir. 1998) (finding no "basis for federal habeas relief" where a petitioner argued that the state's highest court denied him equal protection when it determined in a state collateral proceeding that he could be tried as an adult in circuit court, because the petitioner was "not . . . detained as a result of" that determination); *Shinn v. Ramirez*, 596 U.S. 366, 383 (2023) ("And, because there is no constitutional right to counsel in state postconviction proceedings, . . . a prisoner ordinarily must "bea[r] responsibility" for all attorney errors during those proceedings[.]") (internal citations omitted); *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988) ("[C]laims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief."). An attack on a proceeding collateral to Hamilton's

41

detention, including the manner in which that proceeding is conducted, is not cognizable in a federal habeas corpus petition and is therefore without merit. These claims shall be denied.

## D.   Ineffective Assistance of Counsel

Construing the Petition liberally, Hamilton claims that trial counsel was ineffective for failing to: (1) proffer expected testimony to be elicited from Elkton Police Officers Darienzo and Waldridge, ECF 1, at 11; (2) object to inconsistent verdicts, *id.* at 13-14; (3) allow Hamilton to review pleadings before they were filed which compromised his double jeopardy claim, *id.* at 10; (4) investigate and prevent certain evidence from being introduced such as police bias and evidence fabrication, *id.* at 12, 18; and (5) object to the admission of photographs taken of firearms recovered, id. at 11, 17.   Respondents assert, and this Court agrees, that none of these claims present a meritorious basis for federal habeas relief.

An ineffective assistance of counsel claim cannot be premised on counsel's failure to argue for the admission of irrelevant evidence. *Horne v. Peyton*, 356 F.2d 631 (4th Cir. 1966) (the fact that counsel could have done more is insufficient for reversal absent any showing of harmful consequences). Under *Strickland*, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. There is no "constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present the points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). As noted, this Court must give deference to the State court's findings of fact. Against this backdrop, the failure to proffer the expected testimony of Elkton Police Officers did not prejudice Hamilton. The trial court found that any testimony related to the abuse of Hamilton's daughter by an officer who committed the abuse, and another who was a witness in the prosecution of his colleague – both of whom did not

42

work for the Cecil County Police Department or apparently play any role in Hamilton's investigation and prosecution – was irrelevant. ECF 1-6, at 17. As such, the post-conviction court found harmless any error in the failure of counsel to proffer expected irrelevant testimony. ECF 1-6, at 17.[10] The proffering of irrelevant testimony would not have changed the outcome; Hamilton's claim is without merit.

Hamilton's claim regarding inconsistent verdicts relates to his assertion that the State illegally "subdivided" one conspiracy count into seven different counts. ECF 1, at 20. He claims that his acquittal on the armed robbery count is inconsistent with the guilty finding on the count alleging conspiracy to commit first degree assault because first degree assault is a lesser included offense to armed robbery. ECF 1-6, at 40-41. The Appellate Court of Maryland found that the claim regarding the conspiracy counts was not preserved for review on direct appeal, but "[e]ven if preserved," it noted, "[it] would find that [Hamilton's] argument fails on the merits." *Hamilton*, 2018 WL 904348, at *16. At trial, the "State acknowledged that the conspiracies would have merged for the purposes of sentencing had the jury convicted appellant of more than one conspiracy." *Id.* However, Hamilton was convicted of only one count of conspiracy. *Id.* Further, Hamilton's assertion that his conviction on conspiracy to commit first-degree assault is inconsistent with his acquittal for armed robbery is incorrect. As the Appellate Court of Maryland observed: "Sentences for first-degree assault will often merge into sentences for robbery with a deadly weapon. The reverse, however, is not true." *Hamilton*, 2018 WL 904470, at *5 (citation

---

[10] Additionally, the post-conviction court noted that the Appellate Court of Maryland "ruled on this issue and determined that the trial court did not err in precluding testimony of the desired witnesses." ECF 1-6, at 17. Because the claim had been litigated on direct appeal, the claim was deemed "finally litigated" precluding Hamilton raising it again in post-conviction proceedings. The rule against raising claims that were previously litigated on direct appeal is an adequate and independent state rule of law that also arguably renders this claim procedurally defaulted.

omitted). Hamilton "could have committed an assault with a firearm without having the intention to take and carry away the personal property of another." *Id.* Because Hamilton was convicted of the lesser included offense, merger and double jeopardy do not apply. *Id.* This application of law to the facts of this case by the Appellate Court of Maryland is not unreasonable. Trial counsel's failure to make this argument does not represent deficient performance and therefore does not support an ineffective assistance of counsel claim.

Hamilton contends that his inability to act as co-counsel violated his Sixth Amendment right and also appears to allege that this compromised his ability to present his otherwise-viable double jeopardy argument. ECF 1, at 10. As noted, there was no meritorious double jeopardy argument to raise, and thus his inability to effectively raise the argument is of no consequence. Further, the Appellate Court of Maryland rejected Hamilton's claim that his rights were denied when he was not permitted to act as co-counsel because the two forms of representation are mutually exclusive. ECF 1-6, at 74 (quoting *Parren*, 523 A.2d. at 599). Hamilton was not permitted to pursue both self-representation and representation by counsel under the Sixth Amendment. As such, this claim also fails.

In connection with his claim that counsel was ineffective for failing to investigate police bias and the alleged fabrication of evidence, Hamilton assigns error to trial counsel because the Office of the Public Defender refused to pay for an independent translation of Meran's interview with police. ECF 1, at 12. Hamilton alleges that the translation would have established "the conspiracy theory advanced by the [S]tate was spun from whole cloth by the state's agents." *Id.* Following his conviction, Hamilton did obtain a translation of Meran's interview, which differed from the extemporaneous translation by Det. Valle. *Id.* The difference being that Hamilton's independently obtained translation states that Meran told police officers that, "[w]hen [Hamilton

and Meran-Garcia] finished talking, [Hamilton] went in the house, and when he went in the house, I lost sight of him, and that's when the shooting started." ECF 16-1, at 325. The translation made by Valle during the interview of Meran summarized Meran's recollections on the moments immediately preceding the shooting as follows: "All [Meran] knows is that he stopped there, there was nobody in the driveway, they guy came down, they had the conversation, he goes up, and starts sweeping again." *Id.* at 331. Hamilton also claims that the post-conviction court erred when it found this claim was "finally litigated" in the proceedings held for Hamilton's Motion to Strike because his ineffective assistance of counsel claim was not raised during those proceedings. ECF 1, at 17.

Hamilton's trial counsel testified at the post-conviction hearing. ECF 1-4, at 43-231. He explained that he shared Hamilton's concern that neither of the police officers who translated Meran's statement were familiar with Meran's Dominican dialect which may have led to a mistranslation of his statements. ECF 1-4, at 45-46. To address his concern, trial counsel contacted a court-certified Spanish translator, Laurie Lane, who performed a cursory review of the transcript written in Spanish. ECF 1-4, at 46. Lane informed trial counsel that it would cost $3,000.00 to have the interview translated. *Id.* Because trial counsel was a sole practitioner who had taken Hamilton's case as a panel attorney, he could not absorb the cost of the translation and sought to have the Office of the Public Defender pay for it. *Id.* The request was denied. ECF 1-4, at 47.

Contrary to Hamilton's assertion that the post-conviction court failed to address this ineffective assistance of counsel claim, the court actually rejected the claim after observing:

> Petitioner alleges Counsel was deficient in failing to investigate the pretrial statements of Alexander Meran and to have those statements translated. *See* Petition at 9, ¶ 2. As addressed by the [Appellate Court of Maryland], the trial court did not err in allowing the testimony of Mr. Meran without his pretrial

statements being translated. *See Hamilton v. State of Maryland*, No. 736, Sept. Term, 2015, 2018 WL 904348 (Md. App. Feb. 14, 2018). This Court fails now to see how Petitioner was prejudiced by not obtaining his own translation of the pretrial statements of the witness Mr. Meran. *See Strickland*, 466 U.S. at 687. Petitioner had every opportunity to cross-examine Mr. Meran in person at trial. Moreover, except for the conspiracy theory spun by Petitioner that the police were out to essentially frame him, trial counsel was not deficient in declining to spending [sic] large sums of money ordering a separate translation of the pretrial statements that were in Counsel's possession for a month and a half before the trial commenced. *See id.* Therefore, this allegation fails the *Strickland* test for ineffective assistance of counsel.

ECF 1-6, at 16. Hamilton's allegation that the post-conviction failed to analyze his ineffective assistance of counsel claim is unsupported by the record. Furthermore, this Court finds no error in the post-conviction court's analysis. Trial counsel cross-examined Mr. Meran capably, bringing to light several inconsistent statements he made in various interviews by the police. ECF 1-15, at 22-37; *Hamilton*, 2018 WL 2970775, at *1 ("On cross-examination, defense counsel challenged M[e]ran with those inconsistent statements, which, presumably, had been disclosed as part of the summary of M[e]ran's interviews."). Given that these inconsistencies were adequately probed through questioning, the failure to obtain a different translation of Meran's statement to Det. Valle did not amount to ineffective assistance of counsel.

Hamilton also asserts that he was forced to proceed *pro se* on direct appeal because the Office of the Public Defender delayed his case by seeking endless extensions of time. ECF 1, at 15. A criminal defendant does not have a federal constitutional right to appellate review of his conviction. *See Jones*, 463 U.S. at 751 (no constitutional right to appeal), *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) ("State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all."). However, where appellate review is available as a matter of right, criminal defendants *are* entitled to appellate counsel. *Miller v. Smith*, 115 F.3d 1136, 1141 (4th Cir. 1997) (explaining that the Fourteenth Amendment's due process and equal

protection clauses underpin the rights afforded to indigent criminal appellants), *see also United States v. Marshall*, 872 F.3d 213, 217 (4th Cir. 2017) ("Significantly, the Supreme Court has never held that defendants enjoy the right to counsel of choice on appeal."). Though he enjoyed an appeal as a matter of right and therefore was entitled to counsel, the record before this Court reflects that Hamilton was not denied appellate counsel. Instead, Hamilton became dissatisfied with the length of time it took to brief the issues on appeal and made the choice to discharge his counsel. ECF 1, at 15 (noting that Hamilton believed he had a choice between continuing to be represented by counsel or to "forego their representation[] and delays and fight for himself"). Where, as here, there is no means by which to determine whether appellate counsel's performance was deficient, an ineffective assistance of counsel claim cannot be sustained. Additionally, under the circumstances presented here, consenting to extensions of time or postponements does not constitute deficient performance. Hamilton's perhaps understandable impatience with delays does not mean he was denied the right to counsel when there is no evidence that counsel abandoned Hamilton during his direct appeal.

## CONCLUSION

While this case has been pending, Hamilton filed a Motion for Status Update and for a Certificate of Appealability. *See* ECF 27 and 28. As for the request for an update, the motion will be denied as moot because of the issuance of this opinion. The Court also denies the motion for of a certificate of appealability as moot as it will address the issue now.

Since Hamilton's detention arose out of State court process, this Court must determine if a certificate of appealability is warranted. *See* 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Buck v. Davis*, 580 U.S. 100, 115 (2017). The petitioner

"must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. *See* 28 U.S.C. § 2253(c)(2).

Hamilton may, however, still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

A separate Order follows.

9/23/24

Date

Brendan A. Hurson
United States District Judge